UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

GEA WESTFALIASURGE, INC.,

        Plaintiff,

v.                                                                     Case No. 08-C-925

LAWRENCE NEUBAUER, et al.,

        Defendants.

**DECISION AND ORDER**

        Plaintiff GEA Westfaliasurge, Inc. ("GEA") brought this action against Lawrence Neubauer and his corporation, Concept Electric, Inc., alleging various state law theories of slander and trade disparagement. (The parties are of diverse citizenship.) Following some discovery disputes and an amended complaint, the Defendants' motion for summary judgment is now ripe for consideration. For the reasons given below, the motion will be granted.

**I. Background**

        Plaintiff GEA manufactures the ProForm Pulsation System and other equipment used for milking cows. An improperly functioning pulsation system can be extremely damaging to a dairy farm, as it can lead to inflammation of the cows' udders and impact the quality of the milk produced, which translates into economic losses for the farmer. In recent years, the Spring Grove Dairy in Brodhead, Wisconsin, was experiencing significant problems relating to milk quality, which resulted in several years of reduced revenues. Dan Monson, one of the dairy's owners,

contracted with Defendant Neubauer and his company for electrical work and consulting at the dairy. In this lawsuit Plaintiff GEA alleges that in 2007 Neubauer told Dan Monson that the GEA pulsators the dairy was using were receiving inadequate electrical power because the wiring GEA had recommended was flawed. He also recommended that Monson remove the GEA milking system, including the ProForm pulsation controller. Monson ultimately acted on Neubauer's advice, although he replaced the ProForm system with another product from GEA.

GEA alleges that Neubauer's theories are "junk science" and that Neubauer had no expertise in the area of pulsators. Moreover, he did no testing nor analysis of the Spring Grove pulsation system before recommending that it be replaced, despite the fact that there were industry standards in place for measuring pulsation operation. According to GEA, Neubauer's opinions caused Monson to rewire the pulsation system without any input from GEA. GEA alleges that Neubauer's statements were part of a pattern of disparagement based on the fact that he told dairymen in Indiana, New Mexico and California that he had seen problems with GEA's pulsation system in Wisconsin, Idaho and Iowa. In GEA's view, these statements were part of a systematic endeavor to disparage GEA's products, and it alleges that Neubauer's unfounded statements forced GEA to offer some $150,000 in discounts to Monson for new equipment it sold him.

## II. Analysis

Summary judgment is proper where "there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Darst v. Interstate Brands Corp.,* 512 F.3d 903, 907 (7th Cir.2008). Plaintiff GEA has brought claims based on slander, trade disparagement and deceptive trade practices.

2

The elements of a common law action for defamation are: (1) a false statement; (2) communicated by speech, conduct or in writing to a person other than the one defamed; and (3) the communication is unprivileged and tends to harm one's reputation, lowering him or her in the estimation of the community or deterring third persons from associating or dealing with him or her. *Ladd v. Uecker,* 2010 WI App 28, 323 Wis.2d 798, 804-805, 780 N.W.2d 216, 219 (Wis. Ct. App. 2010). Trade disparagement, as set forth in the Restatement (Second) of Torts, involves the publication of a false statement with the intent or knowledge that the statement will harm the pecuniary interests of another. Rest. (2d) Torts § 623A. Finally, a deceptive trade practice violation has three elements: (1) the defendant made a representation to the public with the intent to induce an obligation; (2) the representation was "untrue, deceptive or misleading"; and (3) the representation materially induced (caused) a pecuniary loss to the plaintiff. Wis. Stat. § 100.18; *Goudy v. Yamaha Motor Corp.,* 2010 WI App 55, 324 Wis.2d 441, 459, 782 N.W.2d 114, 123 (Wis. Ct. App. 2010). As GEA recognizes, all of its claims are premised on the making of a false statement.

Unfortunately much of GEA's brief consists of a hard-to-follow narrative of Neubauer's myriad encounters with various people in the dairy industry in other states. An additional portion of the brief is devoted to an attack on Neubauer's methods as an expert witness in a separate case filed in Idaho. What's missing is much discussion of the alleged defamation, however. The essence of GEA's claim is that Neubauer offered opinions about why the ProForm system was not working properly even though he lacked an adequate scientific basis for those opinions and failed to test them. But this characterization of his statements is not supported by the record, and even if it were, GEA has not explained how a professional's opinions could constitute actionable defamation under these circumstances.

3

The fact that GEA shifts the focus away from what Lawrence Neubauer actually said is likely due to the fact that Dan Monson's deposition testimony cut GEA's case off at the knees. Monson testified that Neubauer's opinion about pulsator wiring consisted merely of a statement that he had seen a similar problem in an Idaho dairy and knew what they had done to fix the problem there. In January 2007 Neubauer told Monson that he had been doing an evaluation at a dairy in Idaho that had similar problems to Monson's dairy. Monson testified:

> [H]e said that they exchanged the lighter gauge wire for a heavier gauge rated wire, that the people on the farm did the work themself. [sic] [Neubauer] didn't go into a lot of the details other than . . .[he] wanted to share with me that he found something that may have some similarities to some of the unanswered concerns that he had here.

((Dkt. # 31, Ex. A at 40.)

Several months passed. In fact, Monson testified that Neubauer "never made any claims that this is what's wrong or that's what's wrong or this is what you should try to do different; just said this is what we did there." (Dkt. # 31, Ex. A at 38.) A contemporaneous email from Monson supports this version of events:

> On Friday 8/31/07 Jeff Mahlkuch rewired the power supply to all the pulsators per instruction by Larry Nuebauer [sic]. He did something similar at Aardema Group dairies in Idaho and they have seen a dramatic response in higher milk and lower SCC [somatic cell count]. They have the exact same parlor setup as we do here at SGD. Out of desperation to see what else we have not seen or has [sic] missed, we did this and will wait two weeks to see if there is any change in trends with clinical and sub clinical mastitis. Both Larry and Marc at Agri Volt agree that this may be an answer to some of our mystery concerns, but the folks at Westfalia Surge do not!

(Dkt. # 50, Ex. 1.)

Given Monson's testimony (and he is the only witness other than Neubauer himself), there is no basis in the record to conclude that Neubauer even made a "false statement" to Monson.

4

Instead, Monson testified that Neubauer simply explained what had been done at another dairy – something that was *true* – and Monson decided to give it a try after seeing something similar at a dairy in Illinois. Even taking the facts in the light least favorable to Neubauer, at most he expressed an opinion about what *could* have been wrong with the pulsation system. *Quilici v. Second Amendment Foundation,* 769 F.2d 414, 418 (7th Cir. 1985) ("While false statements of fact receive no constitutional protection, the expression of an opinion can never be false so as to constitute a false statement of fact.") (quoting *Naked City, Inc. v. Chicago Sun-Times,* 395 N.E.2d 1042, 1043 (Ill. App. Ct. 1979)). Neubauer's statements were opinions, or guesses – the kinds of ideas commonly exchanged in circumstances like those at issue here where a problem has proved vexing for a long time. Monson himself described the period of low milk quality as a "nearly four-year nightmare" in which he struggled to figure out why his cows' milk was substandard, (Dkt. # 31, Ex. A at 15), and his email indicates that this was something they did "out of desperation." (Dkt. # 50, Ex. 1.) Nowhere is there evidence that Neubauer asserted as a matter of fact that the wiring of the pulsation system was definitely faulty. It was simply a shot in the dark, nothing more.

Moreover, GEA's claim is based on the notion that Neubauer had some sort of Svengali-like control over Monson and was able to manipulate his business decisions. But again, the facts do not bear this out. Monson states that he simply called Neubauer occasionally to ask his opinion, and Neubauer gave it. Monson relied on his own opinions, his management team, his partners, veterinarians, and companies called Nuvolt and Agrivolt. (Dkt. # 31, Ex. A at 15.) Eight months passed between the time Neubauer originally brought up the wiring issue and the time Monson implemented the change. At most, Neubauer's opinion was simply one factor that entered into the mix in Monson's decision to rewire and purchase a new system from GEA.

5

As noted, GEA's brief does not contain any citations to what Neubauer actually said or explain why the statements themselves were false. Instead, the section of its brief entitled "Falsity of the Publications" merely explains that Neubauer had not done testing on his theory that the wiring of the pulsators affected milk quality. GEA argues that even if the Idaho dairy Neubauer had visited had improved after installing new wiring, Neubauer had no proof that the method of wiring was what helped – the problem could have been caused and resolved by any number of things. Neubauer, in fact, is an expert witness in an Idaho action involving GEA products, and much of GEA's response brief reads like a *Daubert* brief seeking to bar his opinions as unscientific. *See Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579 (1993). But this line of argument is not a substitute for evidence of falsity. Failing to perform testing might disqualify an expert's opinion in a civil case, but it does not, on its own, render the expert's opinion "false." Here, the evidence shows that Neubauer witnessed a wiring issue in Idaho that appeared to be a possible solution to the problem Monson was experiencing in Wisconsin. He was entitled to mention that potential solution without "slandering" GEA's product.

Finally, even if GEA had evidence of a false statement of fact, it is impossible to envision how GEA could prove its damages. It asserts a loss of $150,000 not because Monson decided to drop GEA and go with another manufacturer, but because Monson *did* choose a new GEA product but did so with some trepidation. GEA alleges that the misinformation Neubauer whispered into Monson's ear required it to provide the new system at a substantial discount it otherwise would not have had to offer. If Monson had switched from GEA to another product altogether, then GEA could show it lost a sale and demonstrate its lost profits. But when the customer *stays* with the company and merely obtains a discount, it will be difficult to prove whether, and what part, of the

discount is attributable to the defamation and what part was due to regular market forces. Monson himself believed other dairies had received similar discounts, and there is no evidence that he used Neubauer's statements as leverage in his negotiations with GEA. (Dkt. # 31, Ex. A at 35.) In addition, it is unclear that GEA has even suffered a compensable loss at all. GEA is essentially arguing that it was *entitled* to more profits from the deal with Monson, but that is a difficult premise on which to build a case for damages. Having agreed to the sale in an arm's length transaction, GEA is left to complain that Monson was able to strike a harder bargain due to the advice he received from a professional adviser, and it is unclear that such a complaint actually sets forth a basis for damages at all. But these issues are ancillary to the fundamental flaw in GEA's case, which is that it has not identified an actionable false statement.

For the reasons given above, the Defendants' motion for summary judgment [Dkt. 31] is **GRANTED**. The motion for an extension of time [Dkt. # 65] is **GRANTED**. The clerk is directed to enter judgment in favor of the Defendants and against the Plaintiff.

**SO ORDERED** this ___9th___ day of September, 2010.

                                           s/ William C. Griesbach
                                           William C. Griesbach
                                           United States District Judge